

**SIGNED this 22nd day of February, 2019**

_____
Marcia Phillips Parsons
CHIEF UNITED STATES BANKRUPTCY JUDGE

_____

[This opinion is not intended for publication as the precedential effect is deemed limited.]

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE EASTERN DISTRICT OF TENNESSEE

| | |
|---|---|
| In re<br><br>JIMMY HOLLAND BOYD,<br><br>　　　　Debtor. | No. 17-50593 MPP<br>Chapter 7 |
| WOODBOURNE INVESTMENTS, LLC and WALTER SCHWAB IRREVOCABLE TRUST,<br><br>　　Plaintiffs,<br><br>vs.<br><br>JIMMY HOLLAND BOYD,<br><br>　　Defendant. | Adv. Pro. No. 17-5015 MPP |

## M E M O R A N D U M

APPEARANCES:

| Michael A. Malone, Esq. | Jason H. Arthur, Esq. | Dean Greer, Esq. |
|---|---|---|
| 401 Commerce Street, Suite 900 | 132 Boone Street, Suite 5 | 2809 East Center Street |
| Nashville, Tennessee 37219 | Jonesborough, Tennessee 37659 | Kingsport, Tennessee 37664 |
| *Attorney for Plaintiffs* | *Attorney for Plaintiffs* | *Attorney for Defendant* |

**Marcia Phillips Parsons, Chief United States Bankruptcy Judge.** In this adversary proceeding, the plaintiffs Woodbourne Investments, LLC and Walter Schwab Irrevocable Trust seek a determination that the state court judgments they hold against the debtor Jimmy Holland Boyd for breach of contract are nondischargeable under 11 U.S.C. § 523(a)(2)(A) and (B), (a)(4), and (a)(6). The judgments arise out of the plaintiffs' failed investments in the debtor's wholly-owned company, Slidell Excavating and Trucking, LLC, which investments the debtor guaranteed but failed to repay. Presently before the court is the plaintiffs' motion for partial summary judgment as to their § 523(a)(2)(A), (a)(4), and (a)(6) claims. As discussed below, the motion will be denied because there are genuine disputes as to certain material facts necessary to prove the § 523(a)(2)(A) and (a)(6) claims and the § 523(a)(4) claims fail as a matter of law. This is a core proceeding. *See* 28 U.S.C. § 157(b)(2)(I).

I.

The debtor has spent his decades-long career owning and operating businesses that utilize heavy equipment for excavating and grading. Though most of these businesses were located in Virginia, in 2010 the debtor organized Slidell Excavating and Trucking, LLC ("Slidell"), a sand mining company located in Slidell, Louisiana. The original purpose of the company was to excavate, haul, and sell sand for road construction and post-hurricane levee repairs. But upon learning in 2011 of the demand for "fracking sand" used in the hydraulic fracturing industry to access hard-to-reach oil deposits, the debtor decided to expand Slidell's operations into the fracking sand business. The decision was based in part on a geotechnical engineer's report that the sand underlying the planned lease of an additional 400 acres could be sold as fracking sand.

Slidell's expansion plans were communicated to James Dunkle, a co-owner of Bayview Asset Management. The debtor knew Mr. Dunkle from having previously sold him on behalf of his clients some subdivision lots in 2008 and 2009 that the debtor had developed. After learning about Slidell's expansion plans, Bayview loaned Slidell $130,000 for the purchase of equipment, and Mr. Dunkle's partner and co-owner of Bayview, Kenneth Mahaffy, Jr., began recommending investment in Slidell to some of his clients, including Walter Schwab. The parties disagree as to what transpired next, although it is undisputed that Mr. Schwab subsequently made two investments in Slidell that are the subject of this proceeding. According to the debtor he received

a telephone call from Mr. Mahaffy in February or early March 2012 informing him that Mr. Schwab was interested in investing, and the debtor agreed that Mr. Mahaffy could give Mr. Schwab his telephone number.  The debtor states that Mr. Schwab then telephoned him and that after a couple of phone calls between the two in which the debtor explained the frack sand business and his desire to add an additional beltline that would speed up production but could cost up to a million dollars, Mr. Schwab decided to invest in Slidell.  In contrast, according to Mr. Schwab's son-in-law Dominque Schmidt, after Mr. Mahaffy's initial solicitation to Mr. Schwab, the latter asked Mr. Schmidt to look into a potential investment in Slidell.  Mr. Schmidt states that on March 12, 2012, he telephoned Mr. Mahaffy and that after several phone calls over 48 hours between the two, the details of which Mr. Schmidt relayed to Mr. Schwab, the initial decision to invest in Slidell was made.

It is undisputed that in March 2012 Mr. Schwab invested $250,000 in Slidell through his family partnership, Carrswold Partnership, the predecessor to plaintiff Woodbourne Investments, LLC.  To evidence the arrangement, on March 19, 2012, Carrswold, Slidell, and the debtor individually entered into a contribution agreement whereby Carrswold made a capital contribution of $250,000 to Slidell in exchange for five units of Preferred Series A Interests that Slidell was required to redeem for $275,000 by March 1, 2014.  In addition to the mandatory redemption, the agreement also obligated Slidell to pay Carrswold preferred distributions of 12% annually on its $250,000 investment due February 28, 2013 and 2014.   In the agreement, the debtor personally guaranteed the mandatory redemption and preferred distributions.

After the contribution agreement was executed, Carrswold wired $250,000 to the debtor's personal bank account at Wells Fargo Bank.  Upon receiving the funds, the debtor paid Bayview $150,000 on its earlier $130,000 loan, paid $25,000 to his company JHB & Sons, LLC for Slidell's prior use of its equipment, and used more than $8,000 for a personal trip to Belize with his wife.  The parties dispute whether the funds remaining were used for Slidell but it is undisputed that by May 8, 2012, the balance in the debtor's Wells Fargo account was less than $6,000.

Later that year, Mr. Schwab through the Walter Schwab Irrevocable Trust made the second investment in Slidell.  On December 31, 2012, the Schwab Trust, Slidell, and the debtor entered into a contribution agreement evidencing a capital contribution of $125,000 by the Schwab Trust

3

in exchange for one unit of Preferred Series A Interests that Slidell was required to redeem for $137,500 by August 1, 2013. Slidell was also obligated to pay to Schwab Trust on August 1, 2013, a preferred distribution of 12% on the $125,000 investment. Again the debtor personally guaranteed the mandatory redemption and preferred distribution.

At some point prior to this second investment, Slidell ran out of work and according to the debtor was facing difficulty acquiring the required permits to sell fracking sand. The debtor directed in July 2012 that Slidell's trucks be moved to Tennessee, allegedly for safe-keeping until work resumed, although the plaintiffs allege that the debtor had all of Slidell's equipment moved to Tennessee. The debtor also had some personal issues during this time. In February 2012, he suffered a heart attack which was treated with the placement of a stent. He was hospitalized again briefly in March and April, and finally underwent triple bypass heart surgery on August 6, 2012, leaving him unable to work through October 2012. Then in late 2012 the debtor learned that he was being investigated by the Internal Revenue Service, which investigation led to the debtor's plea agreement on January 4, 2013, to one count of failing to file a tax return for 2007 and one count of failing to collect and remit payroll taxes to the IRS for the first quarter of 2009. On May 8, 2013, the debtor was sentenced to a six-month prison sentence beginning June 4, 2013, followed by a three-year probation, and ordered to pay the IRS $347,303.41 in restitution. Because of prison and then probation restrictions that prohibited him from leaving his state of residence, the debtor was unable to travel to Louisiana to resume Slidell's operations.

Slidell and the debtor never paid the mandatory redemptions and preferred distributions called for by the contribution agreements. That caused the plaintiffs to file suit on April 2, 2015, in the Circuit Court of St. Louis County, Missouri against the debtor, Mr. Mahaffy, and Bayview on four causes of action. The first two were against the debtor for breach of the contribution agreements under which he had guaranteed Slidell's payment of the mandatory redemptions and preferred distributions. The third cause of action was against Mr. Mahaffy and Bayview for breach of fiduciary duties, and the final cause of action was against all three defendants for negligent and fraudulent misrepresentations. After the debtor failed to file an answer, the state court on February 5, 2016, entered judgments against the debtor on the two breach of contract counts. Woodbourne received a judgment in the amount of $275,000 plus 12% interest from March 1, 2012, to the date

of judgment, and the Schwab Trust received a judgment in the amount of $137,000 plus 12% interest from August 1, 2013, to the date of judgment.

As to the remaining two causes of actions in the state court action, Mr. Schmidt states that Mr. Mahaffy was found by the state court to have committed fraud. Mr. Schmidt provides no foundation for this statement, which the debtor denies, and the plaintiffs have not come forward with an order or opinion from the state court so that the finding of fraud against Mr. Mahaffy can be established as fact. The court further notes that Mr. Schmidt never identifies his relationship with the plaintiffs other than to say that he is "married to Walter Schwab's 2nd daughter" and "[f]or more than ten years . . . provided various services as a business manager for many of the entities related to the Schwab family," without indicating whether that includes either of the plaintiffs.

On April 8, 2017, the debtor filed a voluntary petition commencing the underlying chapter 7 case. Thereafter, the plaintiffs filed the complaint initiating this adversary proceeding seeking a determination that the judgments they hold against the debtor are nondischargeable under § 523(a)(2)(A) and (B), (a)(4), and (a)(6) of the Bankruptcy Code, based respectively on fraud and fraud in connection with a written false statement concerning the debtor's or an insider's financial condition, embezzlement or larceny, and willful and malicious injury. In their present motion, the plaintiffs request summary judgment on all the claims except § 523(a)(2)(B). The plaintiffs rely upon their statement of undisputed material facts supported by declarations from Mr. Schmidt, Alan Breckenridge, and Sailin Pattni, excerpts from the debtor's October 1, 2018 deposition testimony, certain requests for judicial notice, and the pleadings. The debtor opposes the motion, likewise relying upon the pleadings and his own statement of undisputed material facts supported by his affidavit. Both sides in response to the other's statement of undisputed material facts deny certain portions of those statements.

II.

Federal Rule of Civil Procedure 56(a), as incorporated by Federal Rule of Bankruptcy Procedure 7056, provides that "[a] party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought" and that the "court shall grant summary judgment if the movant shows that there is no genuine dispute

as to any material fact and the movant is entitled to judgment as a matter of law." The initial burden to demonstrate the absence of a genuine dispute of material fact rests with the moving party. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the initial burden has been met, it then shifts to the non-moving party to present specific facts demonstrating that there is a genuine dispute of material fact for trial. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). Both parties must support their assertions "that a fact cannot be or is genuinely disputed" by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A). In the alternative, either party may carry its burden by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(B). However, the party opposing the motion "'may not rest upon mere allegations or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial.' The party opposing the motion must 'do more than simply show that there is some metaphysical doubt as to the material facts.'" *Spradlin v. Jarvis (In re Tri-City Turf Club, Inc.)*, 323 F.3d 439, 442 (6th Cir. 2003) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Matsushita*, 475 U.S. at 586); *see also Nye v. CSX Transp., Inc.*, 437 F.3d 556, 563 (6th Cir. 2006) (stating that a "mere scintilla of evidence in support of the nonmoving party will not be sufficient").

When considering a summary judgment motion, the court may not weigh the evidence to determine the truth of the matter asserted but must simply determine whether a genuine dispute for trial exists. *See Anderson*, 477 U.S. at 249. The facts and all resulting inferences are to be viewed in a light most favorable to the non-moving party, and the court must decide "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id*. at 251-52. "Summary judgment in favor of the party with the burden of persuasion is inappropriate when the evidence is susceptible of different interpretations or inferences by the trier of fact." *Arnett v. Myers*, 281 F.3d 552, 561 (6th Cir. 2002) (quoting *Hunt v. Cromartie*, 526 U.S. 541, 553 (1999)). However, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita*, 475 U.S. at 587 (citations omitted).

6

III.

Section § 523(a) of the Bankruptcy Code provides in pertinent part:

(a) A discharge under section 727 . . . of this title does not discharge an individual debtor from any debt—
. . . .
(2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—
(A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition;
. . . .
. . . .
(4) for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny;
. . . . [or]
(6) for willful and malicious injury by the debtor to another entity or to the property of another entity . . . .

11 U.S.C. § 523(a)(2)(A), (a)(4), and (a)(6). The objecting creditor has the burden of proof which must be met by a preponderance of the evidence. *See Grogan v. Garner*, 498 U.S. 279, 286-87 (1991). Moreover, "exceptions to discharge are to be strictly construed against the creditor." *Rembert v. AT&T Univ. Card Servs., Inc. (In re Rembert)*, 141 F.3d 277, 281 (6th Cir. 1998) (citing *Manufacturer's Hanover Trust v. Ward (In re Ward)*, 857 F.2d 1082, 1083 (6th Cir. 1988)). Because each plaintiff has a separate judgment, arising out of each's investment in the debtor's company Slidell, the court must determine whether each plaintiff has demonstrated that there is no genuine dispute as to any material fact and that it is entitled to a determination that its judgment is nondischargeable as a matter of law.

A. The Plaintiffs' § 523(a)(2)(A) Claims.

For a debt to be nondischargeable under § 523(a)(2)(A), the Sixth Circuit Court of Appeals requires a plaintiff to demonstrate that:

(1) the debtor obtained money through a material misrepresentation that, at the time, the debtor knew was false or made with gross recklessness as to its truth; (2) the debtor intended to deceive the creditor; (3) the creditor justifiably relied on the false representation; and (4) its reliance was the proximate cause of its loss.

7

*In re Rembert*, 141 F.3d at 280-81. "Generally, a material misrepresentation [under § 523(a)(2)] can be defined as 'substantial inaccuracies of the type which would generally affect a lender's or guarantor's decision.'" *Haney v. Copeland (In re Copeland)*, 291 B.R. 740, 761 (Bankr. E.D. Tenn. 2003) (quoting *Candland v. Ins. Co. of N. Am. (In re Candland)*, 90 F.3d 1466, 1470 (9th Cir. 1996)); *see also* 4 Collier on Bankruptcy ¶ 523.08[1][d] (16th ed. 2018) ("A material fact is one touching upon the essence of the transaction."). "Silence regarding a material fact can constitute a false representation actionable under § 523(a)(2)(A)." *Fee v. Eccles (In re Eccles)*, 407 B.R. 338, 342 (B.A.P. 8th Cir. 2009) (citation omitted).

Moreover, "actual fraud as used in § 523(a)(2)(A) is not limited to misrepresentations and misleading omissions." *Mellon Bank N.A. v. Vitanovich (In re Vitanovich)*, 259 B.R. 873, 877 (B.A.P. 6th Cir. 2001). It encompasses "any deceit, artifice, trick, or design involving direct and active operation of the mind, used to circumvent and cheat another." *Id.* (citing 4 Collier on Bankruptcy ¶ 523.08[1][e] (16th ed. 2018)). "False representations and implied misrepresentations that are intended to create and foster a false impression by co-conspirators in furtherance of a fraudulent scheme may be attributed to a debtor who is an active, willing and knowing participant in the fraudulent scheme for purposes of § 523(a)(2)(A)." *Bank of Cordell v. Sturgeon (In re Sturgeon)*, 496 B.R. 215, 223 (B.A.P. 10th Cir. 2013). Fraud under § 523(a)(2)(A), whether through false representations, material omissions, or schemes to defraud, requires an intent to defraud, measured by a subjective standard. *See In re Rembert*, 141 F.3d at 281 ("the proper inquiry to determine a debtor's fraudulent intent is whether the debtor subjectively intended to repay the debt"). Because subjective analysis of a debtor's fraudulent intent is extremely difficult to establish, "a debtor's intention–or lack thereof–must be ascertained by the totality of the circumstances." *Id*. at 282.

Turning first to the March 2012 investment made by Carrswold, its successor plaintiff Woodbourne asserts that a number of material misrepresentations were made and certain material facts were omitted, which fraudulently induced the investment in Slidell. According to Mr. Schmidt, during the phone calls between Mr. Schmidt and Mr. Mahaffy that allegedly led to the investment, Mr. Mahaffy stated that investing in Slidell would be "very safe" and a "golden opportunity to make a lot of money," and that he had visited the sand plant in Louisiana where the operations took place and "was very impressed by his visit." As for omissions, Woodbourne does

8

not separately identify the omitted material facts involved in its investment. Rather, Mr. Schmidt, speaking for both plaintiffs, states "we would not have invested either time in Slidell" if "we had been so informed" that:

- Mr. Boyd actually had very little net worth;
- Slidell lost money in 2011, had essentially no income in 2011, and was losing massive amounts of money in 2012;
- Slidell had "run out of work," Mr. Boyd had had a heart attack and was unable to run the company, Slidell had a previous loan for $300,000 which it had been unable to pay back, and Mr. Boyd was under investigation for tax fraud; and
- Mr. Boyd intended to use plaintiffs' funds for other companies, for his own personal use, or to pay Mr. Mahaffy.

Woodbourne contends that the debtor is liable for the statements and omissions of Mr. Mahaffy because they were co-conspirators in the fraud or because Mr. Mahaffy was the debtor's agent, even though it is undisputed that Mr. Mahaffy and Bayview from 2010 to 2013 provided investment advice to Mr. Schwab and his companies pursuant to a written investment advisory agreement. To support its assertion that Mr. Mahaffy was the debtor's agent or that the two were co-conspirators, Woodbourne references the following undisputed facts: (1) the debtor repaid Bayview's loan with the March 2012 investment proceeds; (2) another client of Mr. Mahaffy's made a capital contribution of $500,000 in Slidell in March 2012 without the debtor speaking to the investor before the investment; (3) the debtor admitted in his discovery deposition taken on October 1, 2018, that he had provided the Geotech report to Mr. Mahaffy, that he had talked to Mr. Mahaffy about getting investment money or loans for Slidell, and that it was okay that Mr. Mahaffy, Mr. Dunkle, and Bayview had sent information about Slidell to possible investors; and (4) Mr. Mahaffy coordinated getting the signatures on the contribution agreements prepared by debtor's counsel and provided plaintiffs with the bank routing instructions. Woodbourne also references the statement in Mr. Schmidt's declaration that the debtor told him at the time of the second investment that Mr. Mahaffy was working on his behalf to find investors for Slidell.

The debtor denies that Mr. Mahaffy was his agent or that they were co-conspirators. He further denies that he retained Mr. Mahaffy to promote Slidell or to solicit investors for the company, or that he made statements to this effect to Mr. Schmidt, although the debtor admits that he provided Slidell's Geotech report to Mr. Mahaffy and discussed with him the amount of money Slidell needed for its expansion. The debtor also admits that he had no objection if Mr. Mahaffy

9

recommended investment in Slidell to his clients, but denies that he provided any details of Slidell's or his personal financial condition to Mr. Mahaffy or that he authorized Mr. Mahaffy to make any statements regarding either's financial condition. Lastly, the debtor states that Mr. Mahaffy had no position with Slidell and that they were never in business together.

"The party seeking to assert agency must prove its existence, as well as the scope and the extent of the agent's real and/or apparent authority through the relevant facts and circumstances." *Lansden v. Jones (In re Jones)*, 585 B.R. 465, 512 (Bankr. E.D. Tenn. 2018). Under traditional principles of agency, "[a]n agency relationship arises when the principal manifests assent or intention to have an agent act on its behalf and subject to its control, and the agent consents to do so." *State v. Willis*, 496 S.W.3d 653, 709-10 (Tenn. 2016). "The most indicative factor in determining whether a principal-agent relationship exists is the right of the principal to control the conduct of the work of the agent." *Bowman v. Benouttas*, 519 S.W. 3d 586, 597 (Tenn. App. 2016).

The evidence before this court is not so one-sided that it must conclude as a matter of law that Mr. Mahaffy was the debtor's agent or co-conspirator such that his representations or omissions may be attributed to the debtor. Given that Mr. Mahaffy was undisputedly Mr. Schwab's financial advisor at the time and presumably in the business of finding investments for him, the fact that Mr. Mahaffy arranged Mr. Schwab's and that of another client's investments after talking to the debtor does not necessarily establish that Mr. Mahaffy consented to act or was acting as the debtor's agent. Granted, the debtor undeniably brought the potential investment to Mr. Mahaffy with the logical inference that he wanted him to suggest Slidell as a possible investment for his clients. But viewing the evidence in the light most favorable to the debtor, the court is unable to conclude that he was authorizing Mr. Mahaffy to act as his agent or that Mr. Mahaffy was consenting to do so. And while the debtor's repayment of the Bayview loan from the investment solicited by Mr. Mahaffy raises a potential red flag, its suspicious nature is countered by the debtor's statements that no restrictions were placed on how Slidell could use the capital contribution and that he had informed Mr. Schmidt at the time that he had some bills to pay. Further, the court notes that the plaintiffs allege in their state court complaint that Mr. Mahaffy had advised them that he had personally invested in Slidell such that they were aware that Slidell had another investor with possible repayment obligations at the time of the March

10

investment in Slidell. Lastly, the court attaches no significance to the ministerial role played by Mr. Mahaffy in obtaining the parties' signatures or in providing the wire transfer instructions. It is not unusual for a financial adviser to do that for his client, which was just as likely for the benefit of Mr. Schmidt as the debtor.

Moreover, the alleged representations by Mr. Mahaffy that he had been "very impressed by his visit" to Slidell and that the proposed investment would be "very safe" and a "golden opportunity to make money a lot of money" are mere opinions and puffery, insufficient to provide a basis for nondischargeability under § 523(a)(2)(A). *See, e.g.*, *In re Copeland*, 291 B.R. at 762 (debtor's representation to creditor that debtor's company was "very profitable" and that "they were very fortunate" "can only legitimately be classified as puffery and opinion, which do not rise to the level of fraud necessary for nondischargeability under § 523(a)(2)(A)"); *Smith v. Meyers (In re Schwartz & Meyers)*, 130 B.R. 416, 423 (Bankr. S.D.N.Y. 1991) (statement that investment is "as safe as in a bank" is merely an expression of opinion, expectation, or declaration of intention, not a representation of existing fact actionable under § 523(a)(2)(A)).

And to the extent that it can be argued that the alleged statements by Mr. Mahaffy as to the safeness of the investment were not mere opinions and puffery, they are nonetheless not actionable under § 523(a)(2)(A) or (B) because they are oral statements respecting Slidell's (an insider's) financial condition. *See, e.g., Lamar, Archer & Cofrin, LLP v. Appling*, 138 S. Ct. 1752, 1759-1761 (2018) (recognizing oral representations that "I am above water" or "I am in good financial shape" are statements respecting the debtor's financial condition that would need to be in writing to foreclose discharge of the debt). The same is true for any omitted statements about the debtor's low net worth or Slidell's lack of income and inability to pay its liabilities. The debtor denies these allegations, stating that the referenced $300,000 loan had been satisfied by a conveyance of realty, that as of spring 2012 Slidell had cash resources of $685,569.68, as well as heavy equipment and trucks worth over one million dollars, and that he owned construction equipment and trucks worth about $400,000. Regardless of the truth of these statements, the alleged omissions pertain to the financial condition of the debtor and his insider company and are not actionable under § 523(a)(2). *See Metz v. Bentley (In re Bentley)*, 531 B.R. 671, 690 (Bankr. S.D. Tex. 2015) (alleged omissions relating to the debtor's financial condition are not actionable under § 523(a)(2)). To hold otherwise would defy logic, as it would produce the untenable conclusion that an oral representation

11

regarding one's financial condition is not actionable, but silence regarding one's financial condition would be.

The remaining alleged omissions may provide a basis for a determination of nondischargeability to the extent that they meet the elements of the Sixth Circuit's four-part *Rembert* test. As previously stated, the first element is that the debtor obtained money through a material misrepresentation, known by him to be false at the time or made with gross recklessness as to its truth, or through the omission of a known material fact. Applied to this case, there is no dispute that the debtor obtained $250,000 from Carrswold. Although the investment was in the debtor's company Slidell, the Sixth Circuit Court of Appeals has recognized that a debtor who fraudulently induces a loan to a corporation that he controls may be liable for purposes of § 523(a)(2)(A). *See McAllister v. Brady (In re Brady)*, 101 F.3d 1165, 1172 (6th Cir. 1996), *abrogated on other grounds as explained in National Dev. Servs. v. Denbleyker (In re Denbleyker)* 251 B.R. 891, 896 (Bankr. D. Colo. 2000).

As to the truth of the alleged omissions, the debtor denies that Slidell had shut down operations due to lack of work at the time of the investment on March 21, 2012, and states that this did not occur until late June 2012. The only evidence that Woodbourne offers to support this contention is the debtor's October 1, 2018 deposition testimony, wherein the debtor is alleged to have stated that Slidell ran out of work "at the time of his heart attack." But a careful reading of the deposition transcript only establishes that the debtor stated "after I had my heart attack" and this was in response to a line of questioning about when and why Slidell's employee Sailin Pattni left "down there," presumably referring to Louisiana. The debtor testified that Mr. Pattni lived there for all of 2010, 2011, and 2012, and that he left there because "we ran out of work . . . after I had my heart attack." In the same deposition, the debtor testified that he personally worked "down there" three or four months, maybe longer, after the March 2012 investment. Mr. Pattni states in his declaration offered by the plaintiffs that after the equipment was moved in mid-2012, no work was performed by Slidell in Louisiana, which suggests that work was performed by Slidell until then. In conclusion, Woodbourne has failed to establish that Slidell shut down operations before the March investment.

Regarding the other alleged omissions, the debtor does not deny that the plaintiffs were not informed regarding his health issues or his planned use of the investment. But the debtor explains that Mr. Schwab did not ask how he intended to use the investments and placed no restrictions on their use, as he understood that this was a recent start-up company that had a lot of upfront expenses, especially for equipment. There is no suggestion that the debt to Bayview was not a legitimate debt of Slidell's, nor that the payment to JHB & Sons for Slidell's use of its equipment was not owing, as the debtor states that the equipment had been brought in from Fredericksburg, Virginia to help with clean up after a flood. While the debtor's use of over $8,000 for a personal trip by him and his wife to Belize is undoubtedly questionable, the debtor responds that he did not otherwise draw a paycheck or take regular compensation from Slidell. As to the debtor's health issues, although the record establishes that he had a heart attack in February, treated by the placement of a stent, and that there was a subsequent brief hospitalization for angina in March, the debtor states that he continued to work for Slidell during this time except for the short periods that he was hospitalized. Viewing the evidence in the light most favorable to the debtor, as this court is compelled to do when considering the plaintiffs' summary judgment motion, the court concludes that genuine issues of material fact remain as to whether the debtor's failure to disclose his health issues and his use of the invested funds were material and made with the intent to deceive. *See FIA Card Servs., N.A. v. Wagner (In re Wagner)*, Adv. Pro. No. 11-3020, 2012 WL 6737830, at *5 (Bankr. N.D. Ohio Dec. 28, 2012) ("where a debtor's subjective intent is at issue, summary judgment is generally inappropriate unless all reasonable inferences defeat the claims of the opposing party").

The court turns next to the judgment held by the Schwab Trust arising out of its $125,000 investment in Slidell on December 31, 2012. The evidence tendered by the plaintiff is somewhat contradictory as to whether the debtor or Mr. Mahaffy initiated the investment, although it is undisputed that Mr. Schmidt telephoned the debtor on December 21, 2012, prior to the investment. As Mr. Schmidt explains it, Mr. Schwab had contacted him in late 2012 about increasing his investment in Slidell, as he had been contacted by Mr. Mahaffy to see if he was interested in making an additional investment. Mr. Schmidt then talked by phone with Mr. Mahaffy several times, with the latter again allegedly making similar representations as to the soundness of the investment and the financial ability of the debtor to repay the loan. After these conversations, Mr. Schmidt telephoned the debtor on December 21, 2012. Mr. Schmidt states the debtor confirmed

13

during this conversation that Mr. Mahaffy was working on his behalf to find investors for Slidell, that he was good for the loan in the event Slidell was unable to pay, and that investing in Slidell was a "solid investment, the business was doing well and was profitable and Plaintiffs would make a lot of money." Mr. Schmidt states that after their phone call and a further conversation with Mr. Schwab, the Schwab Trust decided to make the December investment.

Despite Mr. Schmidt's testimony in this regard offered by the plaintiffs, they inexplicably argue that the debtor initiated the second investment, based on his deposition testimony when he referred to a phone conversation that he "guessed" and "assumed" he had initiated, in which he told an unidentified individual that if he wanted to keep on investing, "he needed to send some more money down there so we could get the plant up and going, get all this stuff cleaned up. . . . Then they sent the $150,000." Regardless of the plaintiffs' inconsistency, the debtor denies that he made the statements attributed to him by Mr. Schmidt. The debtor states their conversation was brief because he didn't know who Mr. Schmidt was, since he had always talked directly with Mr. Schwab, and that he told Mr. Schmidt that the plant was temporarily shut down but that he intended to reopen it and start again soon. Mr. Schmidt denies that the debtor informed him about the temporary shut down in the telephone call. And the debtor did not testify in his deposition that he told Mr. Schmidt about the shut down, stating that he was unable to recall much about the phone conversation.

As for omissions, Mr. Schmidt states on behalf of the Schwab Trust that, in addition to the alleged omitted material facts previously listed, the second investment in Slidell would not have been made if the Schwab Trust had been informed that:

- upon receiving the first investment the debtor had immediately transferred $150,000 to Mr. Mahaffy; and that
- Slidell's equipment had been returned to Tennessee, Slidell had essentially been abandoned, Mr. Boyd had had open heart surgery and had not been to Slidell in months, and Slidell had no prospects of making any money in 2013.

As stated previously with respect to the first investment, the alleged oral statements by Mr. Mahaffy and the debtor to Mr. Schmidt regarding the soundness of the investment and the financial ability of the debtor to repay the loan are not actionable. So the court must consider whether there

is any genuine dispute as to the alleged omissions and whether the Schwab Trust has established the required elements of *Rembert* as a matter of law.

First, as with the initial investment, there is no dispute that the debtor obtained money from the Schwab Trust, through the benefit of the investment in his wholly-owned company Slidell. Moreover, the status of Slidell's business operations and the debtor's planned use of the investment proceeds, especially given the fact that the business was shut down, are material facts that would affect an investor or lender's decision. And while there was no evidence that the debtor's personal presence in Louisiana or personal running of Slidell was a critical component of the Schwab Trust's investment decision, undeniably an inability to work due to severe health issues or imprisonment could impact an investor's decision since the debtor had personally guaranteed the repayment of the investment. Although the parties dispute whether the Schwab Trust was informed about the status of Slidell's business operations, there is no dispute that the debtor failed to disclose the criminal investigation against him or the further deterioration in his health, with its impact on his business operations.

Nonetheless, the court is unable to conclude that the totality of the circumstances establish as a matter of law that the debtor withheld these facts with an intent to deceive. The debtor states that he was able to return to low stress work by the end of October 2012, and that while his physical activities were still somewhat limited through the end of 2012, he was able to return to most ordinary activities and felt that he was recovered enough to try to restart Slidell's operations at the time of the Schwab Trust's investment. As it pertains to the criminal investigation, the debtor states that he did not know that he was going to be criminally charged until January 4, 2013, and despite his subsequent guilty plea, believed until his sentencing on May 8, 2013, that his only punishment would be a fine and probation because he had no prior criminal record. Thus, a genuine issue of material fact exists as to whether the debtor refrained from disclosing this information with the intent to deceive.

Additionally, it does not appear to the court that the plaintiffs have established reliance and that their reliance was the proximate cause of their losses as required by *Rembert*. The only evidence on these elements is the declaration of Mr. Schmidt, wherein he states that the plaintiffs would not have invested either time in Slidell had they not been induced into doing so based on

15

alleged misrepresentations and omitted material facts. As previously stated, Mr. Schmidt's relationship to the plaintiffs has not been established and nothing in the record confirms that Mr. Schmidt has any authority to speak on behalf of the plaintiffs. Surprisingly, there is no declaration from Mr. Schwab himself, who from all indications was the primary decision maker on behalf of the plaintiffs as well as the owner of the Schwab Trust. Similarly, there are no affidavits from the plaintiffs' principals who signed the contribution agreements, namely Ellen G. Schwab, who was the general partner of Carrswold, and Geraldine Schwab, the trustee of the Schwab Trust. For all the foregoing reasons, the plaintiffs' motion for summary judgment as to their § 523(a)(2)(A) claims will be denied.

### B. The Plaintiffs' § 523(a)(4) Claims.

The plaintiffs claim that the debtor's actions constitute embezzlement or larceny such that their judgments are nondischargeable under § 523(a)(4). Excepted from discharge under this provision is any debt "for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny." For purposes of § 523(a)(4), embezzlement is "the fraudulent appropriation of property by a person to whom such property has been entrusted or into whose hands it has lawfully come." *In re Brady*, 101 F.3d at 1172-73. A creditor proves embezzlement by establishing three elements, "that he entrusted his property to the debtor, the debtor appropriated the property for a use other than that for which it was entrusted, and the circumstances indicate fraud." *Id.* at 1173. In contrast, larceny under § 523(2)(4) is the "felonious taking of another's personal property with the intent to convert it or deprive the owner of the same." *Dean v. Hunter (In re Hunter)*, 484 B.R. 721, 727 (Bankr. E.D. Tenn. 2012) (quoting 4 Collier on Bankruptcy 523.10[2] (16th ed. 2012)); *see also Whitmore Lake Public Schools v. CMC Telecom, Inc. (In re CMC Telecom, Inc.)*, 383 B.R. 52, 66 (Bankr. E.D. Mich. 2008) ("Larceny is commonly understood to be synonymous with theft."). The critical distinction between embezzlement and larceny is that with embezzlement the original taking was lawful or with the consent of the owner. *In re Hunter,* 484 B.R. at 727. Essential to both larceny and embezzlement is the element of fraudulent intent. *Id.* "In short, section 523(a)(4) excepts from discharge debts resulting from the fraudulent appropriation of another's property, whether the appropriation was unlawful at the outset and therefore a larceny, or whether the appropriation took place unlawfully after the property was entrusted to the debtor's care, and therefore was an embezzlement." 4 Collier on Bankruptcy ¶ 523.10[2] (16th ed. 2009).

16

In the present case, the plaintiffs contend that they rightfully entrusted their investments to the debtor, as the president and owner of Slidell, but that he then committed embezzlement when he wrongfully appropriated these funds for his own use. Alternatively, the plaintiffs assert that the debtor wrongfully through fraud came into possession of their property in the first instance, such that he committed larceny. The court disagrees, as the plaintiffs' allegations do not establish the required elements of either tort as a matter of law, even if there was no dispute of fact.

First, as to embezzlement, it is undisputed that the plaintiffs were making investments in Slidell, a legal entity separate from the debtor. There is no authority for the proposition that investments in a wholly-owned company constitute an entrustment of property to the owner or president of the company. Thus, the facts do not demonstrate that the plaintiffs entrusted property to the debtor. Moreover, any claim for embezzlement would lie with Slidell, since the plaintiffs' allegations are that the debtor misappropriated the property that the plaintiffs had invested in Slidell. *See, e.g.*, *Thompson v. Barbee (n re Barbee)*, 479 B.R. 193, 208 (Bankr. S.D. Ga. 2012) (a creditor cannot succeed on a claim of embezzlement where the funds alleged to have been misused by debtor were previously loaned to, and were therefore property of, the corporation of which debtor was one of two shareholders in a closely held corporation); *Sullivan v. Clayton (In re Clayton)*, 198 B.R. 878, 885 (Bankr. E.D. Penn. 1996) (allegations that the debtor embezzled monies from the corporation owned and managed by him is insufficient to establish a claim for embezzlement under § 523(a)(4) in favor of the creditor owed by the corporation and the debtor). Similarly, to the extent that the debtor is guilty of wrongfully misappropriating Slidell's monies for personal use, Slidell has a claim for larceny, not the plaintiffs. Consequently, the plaintiffs' motion for summary judgment as to their § 523(a)(4) claims on the basis of embezzlement or larceny must be denied.

C. <u>The Plaintiffs § 523(a)(6) Claims.</u>

Section 523(a)(6) provides that a debt "for willful and malicious injury by the debtor to another entity or to the property of another entity" is not discharged. The Sixth Circuit Court of Appeals has held that "the judgment must be for an injury that is both willful and malicious. The absence of one creates a dischargeable debt." *Markowitz v. Campbell (In re Markowitz)*, 190 F.3d 455, 463 (6th Cir. 1999). "[U]nless 'the actor desires to cause the consequences of his act, or

17

believes that the consequences are substantially certain to result from it,' he has not committed a 'willful and malicious injury' as defined under § 523(a)(6)." *Id.* at 464 (internal citation omitted).

"An act will be deemed 'willful' only if it was undertaken with actual intent to cause injury." *Cash Am. Fin. Servs. Inc. v. Fox (In re Fox),* 370 B.R. 104, 119 (B.A.P. 6th Cir. 2007). The court is required to evaluate the debtor's mind subjectively "to determine whether the debtor intended to cause the consequences of his act or believed that the consequences were substantially certain to result from his act." *Kloeber v. Montanari (In re Montanari)*, Adv. Pro. No. 13-3079, 2015 WL 603874, at *9 (Bankr. E.D. Tenn. Feb. 12, 2015) (quoting *Monsanto Co. v. Wood (In re Wood)*, 309 B.R. 745, 753 (Bankr. W.D. Tenn. 2004)).

By contrast, "'malicious' means in conscious disregard of one's duties or without just cause or excuse; it does not require ill-will or specific intent to do harm." *Wheeler v. Laudani*, 783 F.2d 610, 615 (6th Cir. 1986). The "key to 'malicious' under § 523(a)(6)" is the "*knowledge of wrongdoing*, not the wrongfulness of the debtor's actions." *ABF, Inc. v. Russell (In re Russell)*, 262 B.R. 449, 455 (Bankr. N.D. Ind. 2001) (emphasis supplied). For purposes of § 523(a)(6), the plaintiffs may demonstrate malice by showing "that (1) the debtor has committed a wrongful act, (2) the debtor undertook the act intentionally, (3) the act necessarily causes injury, and (4) there is no just cause or excuse for the action." *JP Morgan Chase Bank, NA v. Algire (In re Algire)*, 430 B.R. 817, 823 (Bankr. S.D. Ohio 2010) (citing *Vulcan Coals, Inc. v. Howard*, 946 F.2d 1226, 1228 (6th Cir. 1991)).

Moreover, the Supreme Court held in *Kawaauhau v. Geiger*, 523 U.S. 57, 61 (1998), that § 523(a)(6) requires "a deliberate or intentional *injury*, not merely a deliberate or intentional act that leads to injury." *Id.* (emphasis in original). It is insufficient for plaintiffs to merely allege that a "reasonable debtor 'should have known' that his conduct risked injury to others . . . ." *Guthrie v. Kokenge (In re Kokenge)*, 279 B.R. 541, 543 (Bankr. E.D. Tenn. 2002) (internal citation omitted). Finally, "when the subjective intent of the non-moving party is a necessary element of a claim, summary judgment should be denied except in the clearest of cases." *In re Montanari*, 2015 WL 603874, at *9.

In this case, the plaintiffs allege that they were willfully and maliciously injured by the debtor when he twice solicited the plaintiffs for investments that, they allege, he knew would never

18

be put to use in Slidell. The plaintiffs point to the debtor's use of at least some of the investments for his personal use, his stated belief in his deposition testimony that it was appropriate for him to use some of the invested funds for personal use since he was not receiving a salary from Slidell, his commingling of Slidell monies in his personal bank account with that of his other company, and the other facts that provide the basis for their § 523(a)(2)(A) claims, including the alleged statements that the investments were safe and profitable. Lastly, the plaintiffs reference a financial statement signed by the debtor on March 17, 2013, in connection with the criminal case wherein the debtor stated, "No net income is projected from the Slidell, Louisiana project because it is not known if that project will generate any net income in 2013." The plaintiffs cite this statement, given ten weeks after the second investment, as evidence that the debtor knew at the time that it was not possible for Slidell to repay the plaintiffs. They also cite the fact that the debtor had substantial unpaid medical bills from his hospitalizations in 2012.

To the extent the plaintiffs are relying on the alleged oral statements or omissions by Mr. Mahaffy and the debtor that investment in Slidell was safe and profitable for their claims under § 523(a)(6), they have failed to state a basis for relief. "[S]ection 523(a)(6) cannot be used to bootstrap into nondischargeability oral statements as to financial condition that are not actionable under section § 523(a)(2)." *Spencer v. Bogdanovich (In re Bogdanovich)*, 301 B.R. 129, 132 (Bankr. S.D.N.Y. 2003); *see also Weiss v. Alicea (In re Alicea)*, 230 B.R. 492, 508 (Bankr. S.D.N.Y. 1999) ("A creditor armed only with an oral statement of financial condition should not be able to circumvent these protections by charging that the same conduct produced a 'willful and malicious' injury."); *McCrary v. Barrack (In re Barrack)*, 217 B.R. 598, 606 (B.A.P. 9th Cir. 1998) (allegations that did not satisfy section § 523(a)(2) "could not, as a matter of law, meet the requirements of § 523(a)(6)").

Conversely, it has been recognized that allegations that state a claim for relief under § 523(a)(2)(A) may also state a claim for relief under § 523(a)(6). *See In re Alicea*, 230 B.R. at 507-508 ("the provisions of § 523(a)(2)(A) and § 523(a)(6) are not mutually exclusive"). Applied to this case, to the extent that the debtor intentionally defrauded the plaintiffs, such that their judgments are nondischargeable under § 523(a)(2)(A), the debtor also willfully and maliciously injured the plaintiffs within the scope § 523(a)(6). Because genuine issues of material fact exist as to whether the debtor defrauded the plaintiffs, the court similarly concludes that genuine issues

19

are present as to the plaintiffs' § 523(a)(6) claims.  The debtor explains that he used his personal bank account for both personal and business purposes, with his accountant sorting out the two for accounting and tax purposes.  Moreover, although the debtor did state in his March 17, 2013 financial statement that he did not expect any income from Slidell in 2013, there is no indication from the statement that the debtor believed the company to be permanently closed.  To the contrary, he references therein the delay and damages previously experienced by Slidell and states that if he has a chance he intends to make the project in Slidell, Louisiana a success.  Viewing the evidence in the light most favorable to the debtor, the court is unable to conclude that the debtor subjectively intended to willfully and maliciously injure plaintiffs, or that these consequences were substantially certain to occur from the debtor's actions.  Therefore, the plaintiffs' motion for summary judgment as to the § 523(a)(6) claims will be denied.

V.

An order will be entered in accordance with the memorandum opinion denying the plaintiffs' motion for partial summary judgment.